# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| OWAL, INC.,<br><br>     *Plaintiff*,<br><br>v.<br><br>CAREGILITY CORPORATION,<br>MICHAEL BRANDOFINO<br>and RONALD J. GABOURY,<br><br>     *Defendants*. | Civil Action No. 3:21-cv-13407<br><br><br>**MEMORANDUM AND ORDER**<br>**GRANTING IN PART AND**<br>**DENYING IN PART**<br>**DEFENDANTS'**<br>**MOTION TO DISMISS** |

This case is before the Court on Defendants' motion to dismiss Plaintiff's complaint. (ECF No. 15). The Court heard oral argument on February 23, 2021. For the reasons that follow, Defendants' motion to dismiss Plaintiff's complaint is granted in part and denied in part. Fed. R. Civ. P. 12(b)(6)

This Court has original jurisdiction over this matter pursuant to 28 U.S.C § 1331. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C § 1367(a). Additionally, this Court has diversity jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C § 1332 because (1) Plaintiff is a resident of New York and Delaware while Defendants are residents of New Jersey, and (2) Plaintiff alleges damages in excess of $75,000. (Complaint ¶¶6-9, ECF No. 1). Venue is proper in the District of New Jersey under 28 U.S.C §

1

1391(b), because Defendants are citizens of New Jersey and a substantial part of the events giving rise to Plaintiff's claims took place in New Jersey.  (*Id.* at ¶12).

# I.

The litigation stems from the collapse of talks between OWAL, Inc. (OWAL) and Caregility Corporation concerning the possible acquisition of OWAL, Inc. by Caregility Corporation (corporate acquisition).[1]  According to OWAL's Complaint, OWAL began discussions with Defendant Caregility Corporation ("Caregility") about a corporate acquisition "sometime in 2020."  (*Id.* at¶14).  OWAL "is an information technology company in the business of developing proprietary security systems software and other technology with applications across a broad range of industries."  (*Id.* at ¶13).  Caregility's business "involves the implementation of telehealth solutions for third party clients."  (*Id.* at ¶15).  Defendant Michael Brandofino ("Brandofino") is Caregility's Chief Operating Officer (COO), and Defendant Ronald J. Gaboury ("Gaboury") is the Chief Executive Officer (CEO) (Gaboury, Brandofino and OWAL are collectively referred herein as, "Defendants").  OWAL was interested in a corporate acquisition so OWAL could obtain a new source of funding necessary to further develop its proprietary technologies and to "broaden the applications and potential markets for

---

[1] The words "merger," "acquisition," "potential transaction," and other derivatives are used interchangeably by the parties; but as stated above, the term "corporate acquisition" is utilized herein.

OWAL's technologies." (*Id.* at ¶14).  Caregility was interested in a corporate acquisition because OWAL's "technology, infrastructure[,] and personnel" could have been adopted into its telehealth business.  (*Id.* at ¶15).

The parties entered into several interim agreements to safeguard their respective interests as they mutually disclosed confidential information in order to effectuate a corporate acquisition.

a.   <u>The Memorandum of Understanding</u>

The parties entered into a memorandum of understanding (MOU) on May 18, 2020.  (*Id.* at ¶16); (Motion to Dismiss Ex. B, ECF No. 15-2).  The MOU made clear that aside from agreements on confidentiality and non-solicitation, "this MOU shall be non-binding on the parties, and is subject to the formal execution" of a corporate acquisition agreement.  (*Id.* at 1).  Most of the MOU was an outline of terms and conditions that would be more fully developed and eventually incorporated into a corporate acquisition agreement.  (*Id.*).  In the interim, OWAL agreed to develop software for monitoring hospital patients, which would be compatible with Caregility's software.  (*Id.* at 9).  With respect to confidentiality, Caregility agreed:  "(1) to hold [OWAL]'s Proprietary Information in strict confidence; (2) not to disclose [OWAL]'s Proprietary Information to any third parties, except as described below; and (3) not to use any Proprietary Information except to perform its obligation and exercise its rights under this MOU . . . ."  (*Id.*

at 4-5).  "Proprietary Information" was defined as:  "business and financial

information, software, source code and specifications, hardware, designs, trade

secrets, technical information, business forecasts and strategies, personnel

information, and proprietary information of third parties."  (*Id.* at 4).  With respect

to non-solicitation, the parties agreed:  "During the term of this MOU . . . and for

two (2) years afterwards, neither Party shall solicit the other Party's officers,

staff[,] or employees for such Party's employment or benefit without the other

Party's prior written consent."  (*Id.* at 5).  The term of the MOU was from April 1,

2020 to April 1, 2021.  (*Id.* at 9).

b.    The Confidentiality Agreement

On September 1, 2020, the parties entered into a confidentiality agreement

(CA) in anticipation of "negotiations leading to a possible [corporate acquisition]."

(Complaint at ¶24); (Motion to Dismiss Ex. C, ECF No. 15-2).  Caregility agreed

to keep confidential certain information ("Confidential Information") it would

receive from OWAL over the course of the negotiations.  (*Id.* at 1).  This

information included:

> all information, whether written or oral, relating to
> [OWAL] provided to or obtained by [Caregility] in
> whatever form including by observation for purposes of
> its evaluation of its interest in engaging in the Proposed
> [corporate acquisition], including all information
> contained therein and all notes, analyses, compilations,
> studies, or other documents which are prepared by
> [Caregility] or at its direction after its receipt of such

4

> information to the extent containing or otherwise
> reflecting or derived from such information . . . .

(*Id.*).  Further, Caregility agreed to be held liable for any breaches of

confidentiality by it or its employees and officers.  (*Id.* at 1-2).  The CA also

included a two-year non-solicitation term prohibiting the parties from soliciting or

hiring the employees of the other party.  (*Id.* at 2-3).  The CA made clear that aside

from "obligations which are expressly identified as being binding . . . no contract

or agreement shall be deemed to exist between the parties unless and until a

definitive [corporate acquisition] agreement has been executed and delivered by

each of the parties thereto . . . .  [T]he term 'definitive [corporate acquisition]

agreement' does not include an executed letter of intent or any other preliminary

written agreement, nor does it include any written or oral acceptance of any offer

. . . ." (*Id.* at 4-5).

c.     The Letter of Intent

In December 2020, the parties signed a letter of intent (LOI) proposing that

OWAL would be acquired by Caregility.  (Motion to Dismiss, Ex. D).  The LOI

made clear that it was "for discussion purposes only, and . . . no binding

obligations shall exist or be implied or be construed with respect to the matters

described in" the LOI "or the subsequent conduct of the parties" until a definitive

corporate acquisition agreement was signed and executed by the parties.  (*Id.* at 1).

Further the LOI "represents only the expression of intent of the parties, does not

5

constitute a contract or agreement, is not binding, and shall not be enforceable against Caregility or OWAL." (*Id.* at 4, ¶9).

The only binding aspects of the LOI were: (1) Caregility would conduct due diligence "to its sole satisfaction"; (2) OWAL would continue to conduct its regular business; (3) OWAL would not seek a "sale, merger, combination, consolidation, joint venture, partnership, recapitalization, restructuring refinancing, or other disposition of all or any material part of OWAL" through January 31, 2021 and for an additional thirty days absent notice by OWAL; (4) the LOI "supersedes and replaces all prior understandings and agreements among the parties . . . relating to the subject matter hereof." (*Id.* at 3-4, ¶¶4, 6-8, 10-11). The LOI outlined a purchase price of OWAL totaling $11 million, comprised of: $500,000 in cash, $2.5 million in promissory notes, and four percent of Caregility's shares, which were valued at $8 million. (*Id.* at 1-2, ¶2); (Complaint at ¶35).

Once the exclusivity period of the LOI expired on February 1, 2021, "Caregility's officers expressed their continued interest in closing on the proposed acquisition of OWAL . . . ." (Complaint at ¶38). On February 16, 2021, Caregility's counsel told OWAL's counsel "that Caregility anticipated closing on the [corporate acquisition] in March 2021." (*Id.*). On February 26, 2021, "Caregility indicated that it was preparing a draft [corporate acquisition]

agreement." (*Id.*).  On March 5, 2021, Caregility's counsel "reassured OWAL's counsel that while Caregility had been focused on a capital raise, it anticipated returning its focus to the [corporate acquisition] and picking up the pace in the following week." (*Id.* at ¶41).  On March 21, 2021, Caregility's counsel "informed OWAL's counsel that he was under a lot of pressure from Caregility to complete a draft [corporate acquisition] agreement, and that he would provide the draft in the following week." (*Id.* at ¶42).  Additionally, Caregility included OWAL on "multiple joint activities, including customer meetings and industry research." (*Id.* at ¶39).  OWAL contends that "Caregility conducted itself as if the [m]erger was a done deal and the parties were integrated into a single entity . . . ." (*Id.*).

On March 19, 2021, Caregility asked OWAL for a "pitch deck" so it could "use some slides 'to present to potential investors groups about OWAL.'" (*Id.* at ¶46).  OWAL "provided two slide decks to Caregility;" but OWAL did not provide any written consent to share the pitch decks with a third party.  (*Id.* at ¶¶46-47).  Further, "Caregility incorporated other data and information obtained from OWAL into its investor presentations, and also verbally disclosed facts about OWAL and the intended [corporate acquisition]," without OWAL's written consent.  (*Id.* at ¶48).

d.   The Non-Disclosure Agreement

On March 25, 2021, the parties entered into a "Mutual Confidentiality and Non-Disclosure Agreement" (NDA).  (*Id.* at ¶51); (Motion to Dismiss Ex. E, ECF No. 15-2).  In sum, the NDA restricted Caregility's use of "any and all proprietary or confidential information of [OWAL]" in evaluating the potential corporate acquisition with OWAL unless Caregility obtained OWAL's written consent.  (Complaint at ¶¶54-56); (Motion to Dismiss Exh. E at 1-2).  This information was identified as "Evaluation Materials."  (Complaint at ¶¶52-54); (Motion to Dismiss Exh. E at 1-2).  The NDA also included a "non-solicitation" provision prohibiting Caregility from soliciting OWAL's employees for employment at Caregility.  (Motion to Dismiss Ex. E at 3, ¶2).  The NDA was for a two-year period.  (*Id.* at 3, ¶2).  Like the other agreements, the NDA made clear:  "The Parties hereto agree that unless and until definitive documentation with respect to the [corporate acquisition] has been signed and delivered by the Parties, none of the Parties shall have any legal obligation of any kind whatsoever to enter into a business transaction involving the Parties by virtue of this [NDA] or any other written or oral communication with respect to the [corporate acquisition]."  (*Id.* at 4, ¶5).

The parties continued to collaborate and trade information.  Sometime in March 2021, Caregility apparently "unleashed its sales team to market and sell OWAL's technology to third parties" without OWAL's consent; OWAL "shut

down" this effort. (Complaint at ¶61). Throughout the months of April and May 2021, the parties continued to hold discussions related to the potential corporate acquisition, discussed the roles of their officers in the combined company, and traded financial statements and valuation models. (*Id.*). Caregility's counsel sent OWAL a draft of a corporate acquisition agreement on April 26, 2021. (*Id.*). On April 28, 2021, Caregility's counsel indicated Caregility did not want to close on the deal before May 10, 2021, for tax purposes. (*Id.*). The parties traded comments on the draft corporate acquisition agreement the latter part of May 2021. (*Id.*). Evidently, at the end of May 2021, OWAL surmised that Caregility was stalling and delaying the closing of the corporate acquisition. As OWAL stated in the Complaint:

> Caregility used the LOI and related agreements to string OWAL along with the promise and expectation of the corporate acquisition so that Caregility could gain access to OWAL's technology and use it as leverage to enhance Caregility's profile for its own capital raising efforts and even to attract a third-party buyer for Caregility.

(*Id.* at ¶62). While continuing to discuss and negotiate a corporate acquisition with OWAL, Caregility solicited a third party, Hill-Rom to acquire Caregility. (*Id.* at ¶63). Caregility "assured OWAL that the Hill-Rom Acquisition would not interfere with the parties' plan to consummate the [corporate acquisition] in early June 2021." (*Id.* at ¶64).

In late May, "Caregility mispresented" to Hill-Rom that OWAL's business and technology were "targeted to the nursing home and assisted living business." (*Id.* at ¶70).  On June 3, 2021, Caregility "displayed a slide presentation to Hill-Rom" in order "to persuade Hill-Rom of the importance of OWAL's technology for Caregility's business model."  (*Id.* at ¶66).  Hill-Rom declined to provide additional funding so Caregility could purchase OWAL, because "Caregility could always just continue licensing OWAL's technology and acquire OWAL at a later date."  (*Id.* at ¶71).  Additionally, Hill-Rom was uninterested in the nursing home and assisted living business, and did not see any value in the corporate acquisition because OWAL was "unlikely to add revenue within the next two years."  (*Id.* at ¶72).

On June 4, 2021, Caregility informed OWAL it would not be "moving forward" with the corporate acquisition because Hill-Rom was acquiring Caregility and Hill-Rom did not have any interest in OWAL.  (*Id.* at ¶65).  Subsequently, Caregility "terminated its [corporate acquisition] with OWAL" and informed OWAL it would "simply take OWAL's source code and . . . hire OWAL's engineers for itself, in direct violation of the non-solicit clauses contained in the [corporate acquisition] agreements between the parties."  (*Id.* at ¶74).

## II.

Defendants moved to dismiss all eleven counts of Plaintiff's Complaint on August 13, 2021.  (ECF No. 15).  The Counts alleged are:

- Count One:  breach out contract (against all Defendants);

- Count Two:  breach of duty of good faith and fair dealing (against all Defendants);

- Count Three:  violation of the New Jersey Trade Secrets Act, N.J.S.A. 56:15-1, *et seq.* (against all Defendants);

- Count Four:  common law misappropriation (against all Defendants);

- Count Five:  violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, *et seq.* (against all Defendants);

- Count Six:  trade libel (against all Defendants);

- Count Seven:  conversion (against all Defendants);

- Count Eight:  "permanent injunction" (against all Defendants);

- Count Nine:  promissory estoppel (against all Defendants);

- Count Ten:  fraudulent inducement (against all Defendants);

- Count Eleven:  tortious interference with prospective economic advantage (against Brandofino and Gaboury).

(Complaint at ¶¶75-167).  On each count, Plaintiff alleges that their damages are equal to the value of the corporate acquisition transaction with Caregility, or $11 million.

11

Under Fed. R. Civ. P. 8(a)(2), a complaint "requires only a short and plain statement of the claim showing that the pleader is entitled to relief."  A motion to dismiss asserts a "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "In deciding a Rule 12(b)(6) motion, a court must take all allegations in the complaint as true and view them in the light most favorable to the plaintiff."  *United States v. Loving Care Agency, Inc.*, 226 F. Supp. 3d 357, 362-63 (D.N.J. 2016).  The plaintiff's factual allegations must give rise to a claim for relief that is "plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The court should disregard legal conclusions and "recitals of the elements of a cause of action, supported by mere conclusory statements."  *Santiago v. Warminster Township*, 629 F.3d 121, 128 (3d. Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678).

The Third Circuit set forth a three-part test for determining whether or not a complaint may survive a motion to dismiss for failure to state a claim:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim."  Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth."  Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

*Id.* at 130 (alteration in original) (quoting *Iqbal*, 556 U.S. at 675, 679).

### A. Counts One and Two:  Breach of Contract, Breach of the Duty of Good Faith and Fair Dealing

OWAL's breach of contract claim is based on Defendants' alleged disclosure of materials and information which was subject to the MOU, LOI, and NDA,[2] to potential investors and Hill-Rom.  (Complaint at ¶¶75-81).  Additionally, Defendants misrepresented information about OWAL to potential investors and Hill-Rom.  (*Id.*).  OWAL also alleges that because Defendants breached their promise by disclosing certain information and materials to Hill-Rom, Hill-Rom directed Caregility not to acquire OWAL, killing the corporate acquisition.  (*Id.* at ¶80).

OWAL additionally alleges that Defendants breached the implied duty of good faith and fair dealing in their agreements by "unlawfully disclosing and misrepresenting information concerning OWAL and its business to potential investors and third-party buyers, including Hill-Rom, and portraying OWAL in a false and negative manner that led Hill-Rom to nix Caregility's planned [corporate acquisition] with OWAL."  (Complaint at ¶91).

In support of the motion to dismiss, Defendants principally argue that the Complaint should be dismissed because damages alleged by OWAL are the value

---

[2]  The Complaint mistakenly omits the CA from this list.  (Opposition at 11 n.1).

of the corporate acquisition ($11 million) as opposed to the reasonable

expectations of loss under the LOI, NDA, MOU and CA.  (Motion to Dismiss at

18-20).  OWAL counters that even if its measure of damages is incorrect, it has set

forth a plausible claim of relief.  (Opposition 11-14, ECF No. 18).

The Complaint adequately alleges a plausible cause of action for breach of

contract and a breach of the covenant of good faith and fair dealing.  In New

Jersey, there are four elements to a breach of contract claim:

> first, that the parties entered into a contract containing
> certain terms; second, that [the] plaintiff did what the
> contract required [the plaintiff] to do; third, that [the]
> defendant did not do what the contract required [the
> defendant] to do, defined as a breach of the contract; and
> fourth, that [the] defendant's breach, or failure to do what
> the contract required, caused a loss to the plaintiff.

*Woytas v. Greenwood Tree Experts, Inc.*, 206 A.3d 386, 392 (N.J. 2019) (quoting

*Globe Motor Co. v. Igdalev*, 139 A.3d 57, 64 (N.J. 2016)); *see also Tracey v.*

*Recovco Mortg. Mgmt. LLC*, 451 F. Supp. 3d 337, 342 (D.N.J. 2020).  To prove a

defendant breached the implied covenant of good faith and fair dealing, a plaintiff

must demonstrate that the defendant acted in bad faith to deny the plaintiff the

benefit of the contract.  *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping*

*Ctr. Assocs.*, 864 A.2d 397, 396 (N.J. 2005); *Morrison v. Amer. Int'l Ins. Co. of*

*Am.*, 887 A.2d 166, 173-74 (N.J. Super. Ct. App. Div. 2005).  *Red Hawk Fire &*

*Sec., LLC v. Siemens Indus.*, 449 F. Supp. 3d 449, 462 (D.N.J. 2020).

As noted above, Defendants do not focus on the elements of the cause of action, but rely on the measure of damages.  Rather, Defendants dispute the fourth element, arguing that the alleged breach of the LOI, NDA, MOU and CA may have caused a loss to the Plaintiff, but it is not a loss equal to the value of the corporate acquisition ($11 million), as that is not a natural and probable consequence of Defendants' breach.  (Motion to Dismiss at 18-19).

It is agreed that a party who breaches a contract is "liable for all of the natural and probable consequences of the breach of [the] contract." *Wyotas*, 206 A.3d at 393 (quoting *Pickett v. Lloyd's (A Syndicate of Underwriting Members)*, 621 A.2d 445, 454 (N.J. 1993)).  "[T]he damages 'must be a reasonably certain consequence of the breach although the exact amount of the loss need not be certain.'" *Nelson v. Elizabeth Bd. of Educ.*, 246 A.3d 802, 812 (N.J. Super. Ct. App. Div. 2021) (quoting *Donovan v. Bachstadt*, 453 A.2d 160, 166 (N.J. 1982)). However, OWAL's allegedly mistaken measure of damages does not warrant dismissal as the Complaint sets forth a plausible cause of action, and the remedy can be determined at a later date.  Therefore, Defendants' motion to dismiss Counts One and Two of the Complaint is denied.

**B.     Counts Three, Four and Five:  Violation of the New Jersey Trade Secrets Act; Common Law Misappropriation; Violation of the Defend Trade Secrets Act**

In Counts Three, Four, and Five of its Complaint, OWAL alleges that Defendants violated the New Jersey Trade Secrets Act (NJTSA), N.J.S.A. 56:15-1, *et seq.*, committed common law misappropriation of trade secrets, and violated the federal Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836, *et seq.*  (Complaint at ¶¶93-114).  In sum, OWAL alleges that:  it shared trade secrets with Defendants; OWAL protected those trade secrets; Defendants unlawfully shared those trade secrets; as a result, the corporate acquisition between OWAL and Caregility collapsed and, in turn, OWAL suffered damages.  (*Id.* at ¶¶93-99, 107-114). Defendants' sole argument to dismiss these counts is that OWAL has failed to describe any trade secrets with sufficient specificity.  (Motion to Dismiss at 33-35). OWAL counters that its Complaint does not need to reveal its trade secrets, and the Complaint places Defendants on notice "as to the specific trade secrets at issue." (Opposition at 24-27).

Because the statutory schemes of the NJTSA and DTSA are "substantially similar as a whole," courts often combine the analyses of the two schemes. *Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 905 n.11 (3d Cir. 2021).  The Third Circuit has described the elements of  NJTSA and DTSA claims as:

> (1) the existence of a trade secret, defined generally as information with independent economic value that the

16

owner has taken reasonable measures to keep secret, 18 U.S.C. § 1839(3); (2) that "is related to a product or service used in, or intended for use in, interstate or foreign commerce[,]" *id.* § 1836(b)(1); and (3) the misappropriation of that trade secret, defined broadly as the knowing improper acquisition, or use or disclosure of the secret, *id.* § 1839(5).

*Oakwood Labs*, 999 F.3d at 905.  To prevail on a claim for misappropriation of trade secrets under the NJTSA, a party must establish:  "(1) the existence of a trade secret; (2) communicated in confidence by the plaintiff to [third party]; (3) disclosed by the [third party] in breach of that confidence; (4) acquired by the competitor with knowledge of the breach of confidence, and (5) used by the competitor to the detriment of the plaintiff." *Merckle GmbH v. Johnson & Johnson*, 961 F. Supp. 721, 730 (D.N.J. 1997); *Rycoline Prods., Inc. v. Walsh*, 756 A.2d 1047, 1052 (N.J. Super. Ct. App. Div. 2000). A common law misappropriation claim has similar requirements, but adds a sixth element.  That is, the plaintiff took precautions to maintain the secrecy.  *Walsh*, 756 A.2d at 1052.

This Court recently defined "trade secret" for the purposes of the NJTSA:

> [T]he first step in any trade secret case is to determine whether the information is "in fact, a trade secret." *Merckle*, 961 F. Supp. at 730.  NJTSA defines "trade secret" as information that derives economic value from being not known or readily ascertainable by others through proper means, and which the holder endeavors to keep confidential.  N.J.S.A. § 56:15-2.  In assessing whether information is a trade secret, courts typically consult six factors:  (1) knowledge of the information outside the business; (2) knowledge of the information by

17

> employees and others in the business; (3) measures taken
> by the owner to keep the information secret; (4) the value
> of the information to the business and competitors; (5)
> the money or effort expended to develop the information;
> and (6) the ease or difficulty with which others could
> acquire or duplicate the information by proper means.

*Intech Powercore Corp. v. Albert Handtmann Elteka GmbH & Co. KG*, No. 14-05508, 2021 WL 1138124 at *7 (D.N.J. Mar. 24, 2021).  The party who asserts the trade secret bears the burden of proving that the information is a secret and not a matter of general knowledge in the industry. *Rohm & Haas Co. v. Adco Chem. Co.*, 689 F.2d 424, 431 (3d Cir. 1982).

"To plead the existence of a trade secret," a plaintiff "must sufficiently identify the information it claims as a trade secret and allege facts supporting the assertion that the information is indeed protectable as such."  *Oakwood Labs*, 999 F.3d at 905.  A "generic list" of "categories of business and technical information" which "could be used to describe documents found in any number of corporations," will not suffice.  *Mallet & Co. v. Lacayo*, 16 F.4th 364, 382 (3d Cir. 2021).  Yet "a plaintiff need not spell out the details of the trade secret to avoid dismissal." *Oakwood Labs*, 999 F.3d at 906 (internal quotation marks omitted). "Rather, the subject matter of the trade secret must be described with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit the

defendant to ascertain at least the boundaries within which the secret lies." *Id.* (internal quotation marks omitted).

Here, OWAL's Complaint identifies the "Evaluation Materials" described in the NDA and the "Confidential Information" described in the CA as the trade secrets subject to the NJTSA and DTSA claims, and common law misappropriation claims. (Complaint at ¶¶93-114). "Confidential Information" included "notes, analyses, compilations, studies, or other documents" prepared by OWAL. (Motion to Dismiss, Exh. C at 1). "Evaluation Materials" included "financial information, business plans and strategies, marketing plans, customer, provider, supplier, licensor, licensee, member, investor, lender and vendor information and lists, software, systems, products, services, and website designs, code, algorithms and technology, trade secrets, records, notes, market studies, reports, financial statements, projections, forecasts, and other documents and information . . . ." (Motion to Dismiss, Exh. E at 1). These descriptions are more than "generic lists" of categories of information, *Oakwood Labs*, 999 F.3d at 907, because OWAL has specified that the "trade secrets" are contained in the materials OWAL provided to Caregility under the NDA and CA. More specifically, OWAL has identified the materials it provided to Caregility in two pitch decks as having been wrongfully utilized. (Complaint at ¶¶46-48). Therefore, the description in the Complaint separates the trade secrets "from matters of general knowledge in

the trade or of special knowledge of those persons who are skilled in the trade, and

. . . permit[s] the defendant[s] to ascertain at least the boundaries within which the

secret lies." *Id.* at 906. Overall, OWAL points to a reasonably finite category of

information as containing its trade secrets. As such, Defendants' motion to dismiss

Counts Three, Four, and Five of the Complaint is denied.

### C.    Count Six:  Trade Libel

OWAL alleges in Count Six of its Complaint that Defendants

"misrepresented the nature and quality of Plaintiff's business to Hill-Rom,"

specifically by mispresenting that OWAL's business was "exclusive to the nursing

home and assisted living business." (Complaint at ¶116). Defendants did so

knowingly or recklessly, and the misrepresentations were allegedly "calculated to

prevent Hill-Rom from dealing with Plaintiff and to interfere adversely with

Caregility's planned [corporate] acquisition of Plaintiff." (*Id.* at ¶117). As a

result, OWAL lost the opportunity to be acquired by Caregility. (*Id.* at ¶¶118-19).

Defendants submit OWAL has failed to allege malice or special damages, which

are required to plead a trade libel claim. (Motion to Dismiss at 36-38).

Trade libel has four elements:  1) communication; "2) with malice; 3) of

false allegations concerning its property, product or business, and 4) special

damages, i.e. pecuniary harm." *Read v. Profeta*, 397 F. Supp. 3d 597, 651 n.37

(D.N.J. 2019); *see also Enriquez v. W. Jersey Health Sys.*, 777 A.2d 365, 378 (N.J.

Super. Ct. App. Div. 2001).  "A plaintiff alleging trade libel must demonstrate that Defendant's statements were false or that they were written with reckless disregard for the truth or falsity."  *Id.* (internal quotation marks omitted).  To allege special damages, "requires that [p]laintiffs allege either the loss of particular customers by name, or a general diminution in its business, and extrinsic facts showing that such special damages were the natural and direct result of the false publication."  *Id.* (internal quotation marks omitted).  Critically, "vague, conclusory allegation[s are] not enough."  *Zoneraich v. Overlook Hosp.*, 514 A.2d 53, 63 (N.J. Super. Ct. App. Div. 1986).  Rather, a complaint alleging trade libel must allege the who, what, when, where, and how of the libelous statement; that is, a complaint must identify who made the statement, what was said, when the statement was made, and where/how the statement was communicated.  *Id.* at 62; *see also Russo v. Nagel*, 817 A.2d 426, 434-35 (N.J. Super. Ct. App. Div. 2003).

OWAL alleges the following communication:

> 70.  Additionally, in a prior, late-May presentation, Caregility misrepresented certain facts concerning OWAL to Hill-Rom, including mischaracterizing the nature of OWAL's business.  Specifically, Caregility described OWAL's business and technology as primarily and substantially targeted to the nursing home and assisted living business when, in fact, OWAL's technology is in no way unique to the nursing home and assisted living business.  Rather, OWAL's technology has applications across a diverse array of industries.

71.  When Caregility subsequently made the June 3 Presentation, Caregility again tried to extract extra funding for the OWAL acquisition, but Hill-Rom declined, telling Caregility it did not want Caregility to acquire OWAL and that Caregility could always just continue licensing OWAL's technology and acquire OWAL at a later date.

72.  Following the presentation, Caregility terminated the [corporate acquisition] deal based on Hill-Rom's lack of interest.  As Brandofino admitted to Reiss, Hill-Rom's lack of interest was based, inter alia, on (i) Caregility's misrepresentations about OWAL's emphasis on the nursing home / assisted living space, because Hill-Rom was not interested in entering the nursing home and assisted living space, and (ii) the fact that Hill-Rom did not see value in the Merger because OWAL was unlikely to add revenue within the next two years, a fact that Gaboury independently confirmed to Michael Barr on June 4, 2021.

.  .  .  .

116.  Plaintiff misrepresented the nature and quality of Plaintiff's business to Hill-Rom by, among other things, making representations to Hill-Rom that Plaintiff's business was exclusive to the nursing home and assisted living business.

117.  The misrepresentations that Defendants made to Hill-Rom were made knowingly and recklessly and were of a kind calculated to prevent Hill-Rom from dealing with Plaintiff and to interfere adversely with Caregility's planned acquisition of Plaintiff.

118.  Defendants' misrepresentations played a material and substantial part in Hill- Rom's decision to nix Caregility's acquisition of Plaintiff.

> 119.  As a result of Defendants' misrepresentations concerning Plaintiff's business, Plaintiff incurred substantial pecuniary harm, including the lost business opportunity to merge into or otherwise be acquired by Caregility and has been damaged in an amount to be determined at trial, but not less than $12 million.

(Complaint at ¶¶70-72, 116-19).

In sum, OWAL has alleged a very specific communication:  a representation made at a late-May and June 3, 2021 presentation by Caregility to Hill-Rom that OWAL's technology was geared toward nursing homes and assisted living facilities.  This allegation covers the who, what, when, where, and how of the libelous statement.  With respect to malice, OWAL has alleged that Defendants made the representations to Hill-Rom in order to derail the corporate acquisition, a fact which suggests Defendants made the statements knowingly and recklessly. *Intervet, Inc. v. Mileutis, Ltd.*, No. 15-371, 2016 WL 740267, at *7 (D.N.J. Feb. 24, 2016).  With respect to special damages, although Defendants argue that OWAL could not have reasonably expected the value of the corporate acquisition, (Motion to Dismiss at 38), this is a question of fact that should not be decided on a motion to dismiss.  Overall, OWAL has stated a claim for trade libel.

### D.    Count Seven:  Conversion

In Count Seven, OWAL alleges Defendants converted OWAL's Evaluation Materials and Confidential Information during the acquisition discussions. (Complaint at ¶¶120-25).  In sum, OWAL alleges Defendants misused the

Confidential Information and Evaluation Materials by "disclosing the materials and information to Hill-Rom and other third parties without Plaintiff's prior authorization and consent," which "exceeded the authorized purposes for which the materials and information were made available to Defendants." (*Id.* at ¶123). Defendants submit that OWAL claims they converted "intangible" property, which cannot be subject to a conversion claim and that OWAL's damages are limited to recovery of the value of the property. (Motion to Dismiss at 38-40). In their reply brief, Defendants add that OWAL merely alleges that Defendants misused the property. (Reply Brief 14-15, ECF No. 18).[3]

Under New Jersey law, "conversion is the intentional exercise of dominion and control over chattel that seriously interferes with the right of another to control that chattel." *Meisels v. Fox Rothschild LLP*, 222 A.3d 649, 661 (N.J. 2020). A claim for conversion gives rise to the following considerations:

> [T]here must first be an assessment of whether defendant has independent dominion and control over the subject property, as that inquiry affects other requirements for this tort. Additionally, where the defendant lawfully acquired plaintiff's property, the plaintiff must show that he demanded the return of the property and that the defendant refused compliance.

---

[3] "[A] moving party may not raise new issues and present new factual materials in a reply brief that it should have raised in its initial brief." *Judge v. United States*, 119 F. Supp. 3d 270, 284 (D.N.J. 2015) (internal quotation marks omitted).

*Id.* at 661.  A defendant exercises "independent dominion or control" where he uses property as his own.  *Id.* at 661-62.  While intangible property, like intellectual property, cannot be converted, *see Impact Protective Equip. v. Xtech Protective Equip.*, No. A-0879-19, 2021 WL 1395618, at *11 (N.J. Super. Ct. App. Div. Apr. 14, 2021), it appears the Complaint refers to tangible documents that OWAL provided to Defendants (Complaint at ¶¶25, 54).

Where possession of property is initially lawful:

> The demand is the linchpin that transforms an initial lawful possession into a setting of tortious conduct. Accordingly, in such circumstances, a demand is essential; a claimant must make a demand at a time and place and under such circumstances as defendant is able to comply with if he is so disposed, and the refusal must be wrongful.  The demand puts the defendant on notice and is crucial when the initial possession is lawful or when it cannot be said that the holder is exercising independent dominion or control.

*Id.* at 661.  Demand for the return of the property is required unless doing so would be futile.  *Id.*

Here, Defendants' initial possession of the Evaluation Materials and Confidential Information was authorized by OWAL; OWAL provided Defendants with the property as Caregility considered acquiring OWAL.  (Complaint at ¶¶120-25).  But nowhere in the Complaint does OWAL allege any demand for return of the property or that doing so would have been futile.  Therefore, OWAL has failed to state a claim for conversion.  Count Seven is dismissed without prejudice.

OWAL may amend its Complaint to allege a demand for the return of the property or that doing so would have been futile.

### E.    Count Eight:  "Permanent Injunction"

In Count Eight, OWAL seeks a permanent injunction to enjoin Defendants from misusing the Evaluation Materials and Confidential Information.  (Complaint at ¶¶126-33).  Defendants seek dismissal of Count Eight, because "permanent injunction" is a form of relief and not a cause of action.  (Motion to Dismiss at 3 n.1).  Generally, "because an injunction is a remedy and not a cause of action, '[a] separate claim for injunctive relief is unnecessary.'"  *Lara v. Cool Clouds Distrib.*, No. 20-8030, 2021 WL 613842, at *13 (D.N.J. Feb. 16, 2021) (quoting *Teva Pharm. USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 681 (E.D. Pa. 2018)); *see also Kabbaj v. Google Inc.*, 592 Fed. Appx. 74, 74 n.2 (3d Cir. 2015).  To me it is a professional courtesy to give notice that such relief will be sought, so I see no harm to the allegations.  Since the Complaint includes a separate demand for injunctive relief, (Complaint at 36), Count Eight is unnecessary.  Count Eight is dismissed with prejudice, but the demand remains.

### F.    Count Nine:  Promissory Estoppel

In Count Nine, OWAL alleges claim of promissory estoppel.  There are four elements to a promissory estoppel claim:  "(1) a clear and definite promise; (2) made with the expectation that the promise will rely on it; (3) reasonable reliance;

and (4) definite and substantial detriment." *Goldfarb v. Solimine*, 245 A.3d 570, 577 (N.J. 2021) (internal quotation marks omitted).  OWAL alleges "Defendants represented to OWAL that it was ready . . . to close on the [corporate acquisition] . . . only subject to ordinary due diligence," but despite those representations, did not close because of the Hill-Rom transaction.  (Complaint at ¶¶134-145).  OWAL lists three of Defendants' representations:

> a.  On February 16, 2021 Caregility's counsel communicated to OWAL's counsel that Caregility anticipated closing on the Merger in March 2021;

> b.  On April 22, 2021, Brandofino represented to Reiss via email that Caregility anticipated closing on the Merger on or about May 11 or 12, 2021; and

> c.  On May 20, 2021, Brandofino informed Reiss that Caregility would likely close on the Merger in the first week of June 2021.

(Complaint at ¶137).

Defendants argue the MOU, CA, LOI, and NDA provide that they are not a formal written agreement of a corporate acquisition.  Where parties clearly intend for an agreement to later be put into writing in order to take effect, "preliminary promises" are not binding.  *Morales v. Santiago*, 526 A.2d 266, 269 (N.J. Super. Ct. App. Div. 1987).

However, OWAL's promissory estoppel claim is more nuanced. Essentially, OWAL claims that it relied on Defendants' representations that they

were genuinely interested in a corporate acquisition, when Caregility never actually intended to acquire OWAL.  (Complaint at ¶¶136-38).  That is, Defendants intended for OWAL to rely on that representation in order to lull OWAL in so that Defendants could inflate its own value when negotiating with another investor like Hill-Rom.  (*Id.* at ¶¶138-41).  OWAL relied on Caregility's genuine interest in a corporate acquisition to its detriment by forgoing other potential acquisitions – which the LOI required – and by laying off employees. (*Id.* at ¶¶142-44).  Therefore, OWAL has stated a plausible claim for promissory estoppel.  *Goldfarb*, 245 A.3d at 577.  As such, Defendants' motion to dismiss Count Nine of the Complaint is denied.

## G.    Count Ten: Fraudulent Inducement

Claims of fraud are subject to the heightened pleading standard of Fed. R. Civ. P. 9(b).  "In alleging fraud . . . , a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  *Id.*  "Fraud in the inducement does not differ materially from common law fraud."  *Square Two, LLC v. JJJ Square Solutions, LLC*, No. A-3065-18, 2021 WL 851091, at *7 (N.J. Super. Ct. App. Div. Mar. 8, 2021).

The elements of common law fraud are that the defendant:

> (1) made a false representation of a material fact, (2) knew or should have known that the representation was

> false, and (3) intended to induce the plaintiff to rely on
> the representation.  In addition, the plaintiff:  (4) must
> have actually relied on the representation in a manner
> justifiable under the circumstances and (5) suffered
> damage as a result of his reliance.

*Agostino v. Quest Diagnostics Inc.*, 256 F.R.D. 437, 468 (D.N.J. 2009); *see also*

*Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 261 (N.J. 2005).

In Count Ten, OWAL alleges that Defendants falsely assured that they fully

intended to acquire OWAL, when in fact, the Defendants were pursuing other

offers.  That is, the Defendants used the Evaluation Materials and Confidential

Information "to boost Caregility's own perceived value and obtain an inflated

buyout."  (Complaint at ¶¶146-57).  As a result of that false representation, OWAL

refrained from pursuing other acquisition opportunities and was "forced to lay off"

employees.  (*Id.* at ¶154-56).  Accordingly, OWAL has stated a plausible claim for

fraudulent inducement.  *Agostino*, 256 F.R.D. at 468.  The motion to dismiss Count

Ten is denied.

### H.      Count Eleven:  Tortious Interference with a Prospective Economic Advantage

In Count Eleven, OWAL alleges tortious interference with a prospective

economic advantage against Brandofino and Gaboury.

"Tortious interference developed under common law is to protect parties to

an existing or prospective contractual relationship from outside interference."

*Printing Mart-Morristown v. Sharp Elecs. Corp.*, 563 A.2d 31, 38 (N.J. 1989).

A plaintiff must demonstrate:  (1) "reasonable expectation of economic advantage"

from a business relationship; (2) interference "done intentionally and with malice,"

which means "the harm was inflicted intentionally and without justification or

excuse"; (3) "the interference caused the loss of the prospective gain"; and (4)

damages as a result of the loss.  *Id.* at 37 (internal quotation marks omitted).

Interference is actionable "even where there is no enforceable contract."  *Id.*

at 36-27.  However, "the right protected is plaintiff's right to *pursue* business."  *Id.*

at 38 (internal quotation marks omitted) (emphasis added).  "[I]f an employee or

agent is acting on behalf of his or her employer or principal, then no action for

tortious interference will lie."  *Vosough v. Kierce*, 97 A.3d 1150, 1160 (N.J. Super.

Ct. App. Div. 2017) (quoting *Dimaria Const., Inc. v. Interarch*, 799 A.2d 555, 561

(N.J. Super. Ct. App. Div. 2001)).  Recovery is barred unless employees act

"outside the scope of their employment and . . . for personal motives, out of

malice, beyond their authority, and otherwise not in good faith in the interests of

the" employer.  *Id.*  "[T]he employee's wrongful conduct may be so far removed

from the scope of his duties that the conduct cannot be viewed as within the scope

of the employment."  *Id.* at 1161.

OWAL alleges "Brandofino and Gaboury intentionally and maliciously

caused Caregility to terminate its corporate acquisition of OWAL by

misrepresenting OWAL's Evaluation Materials and Confidential Information to Hill-Rom, and then used the Confidential Information to solicit OWAL's key employees, including its engineers." (Complaint at ¶¶158-67). Defendants argue dismissal is appropriate for two reasons: 1) the corporate acquisition of Caregility and OWAL was tentative, so it cannot be considered a "prospective economic advantage" (Motion to Dismiss at 29-30); and 2) the Complaint fails to allege that Brandofino or Gaboury acted outside the scope of their employment or acted in their own interest. (*Id.* at 31-33).

Here, the Complaint does not claim that Brandofino and Gaboury had an ulterior motive or were acting outside of the scope of their duties in their dealings with OWAL. Therefore, Count Eleven is dismissed without prejudice. OWAL may amend this Count of the Complaint.

## **ORDER**

**THIS MATTER** having come before the Court on Defendants' Motion to Dismiss (ECF No. 15); and the Court having carefully reviewed and taken into consideration the submissions of the parties, as well as the arguments and exhibits therein presented; and for good cause shown; and for all of the foregoing reasons,

**IT IS** on this 25th day of March, 2022,

**ORDERED** that Counts Seven and Eleven of Plaintiff's Complaint are **DISMISSED WITHOUT PREJUDICE**; and Plaintiff may amend these Counts within thirty (30) days; and it is further

**ORDERED** that Count Eight is **DISMISSED WITH PREJUDICE;** and

**IT IS FURTHER ORDERED** that Defendants' Motion to Dismiss is **DENIED** as to Counts One, Two, Three, Four, Five, Six, Nine, and Ten.

s/*Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.